CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

APR 09 2020

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

## United States District Court
## Western District of Virginia

Raymond Tate
(plaintiff)

v.                                    Case No. 7:19-cv-609

Regional Director D.J. Harmon
Warden M. Breckon
Unit Manager Roger Mullins
Case Manager Rodney Collins
Counselor Dink Willis
Lieutenant M. Hamilton
Property Officer S.W. White
Cook Foreman J. Woodard
Senior Officer B. Johnson
Correctional Officer S. Hutchins
Correctional Officer J. Robbins
Correctional Officer John Doe
United States of America [FN]
(defendants).

## FIRST AMENDED COMPLAINT

Comes now the plaintiff, Raymond Tate, pro se, amending my Complaint (Doc. 1) under Federal Rules of Civil Procedure "Rule 15." Defendants' Motion to Dismiss (Docs. 28 and 29) were filed and served on March 30, 2020.

Respectfully submitted,

Raymond Tate

Raymond Tate #27381-001
USP Lee
P.O. Box 305
Jonesville, VA 24263

[FN] The United States of America is named as a defendant for purposes of injunctive relief only.

1

## CONTENTS

|  | page nos. |
|---|---|
| I. Jurisdiction | 2 |
| II. Plaintiff | 2 |
| III. Defendants | 2 |
| IV. Statement of Facts | 3-22 |
| V. Declaration | 22 |
| VI. Claims for Relief | 23 |
| VII. Requested Relief | 23-24 |
| VIII. Exhibit List | 24-25 |
| IX. Certificate of Service | 25 |
| Exhibits A-CC | |

### I. Jurisdiction

This Complaint is brought under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 US 388 (1971). This Court has jurisdiction under 28 USC §1331(a).

### II. Plaintiff

Raymond Tate #27381-001
United States Penitentiary Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, Virginia 24277
P.O. Box 305
Jonesville, Virginia 24263

### III. Defendants

All above named defendants were acting under color of federal law in the scope of their employment as agents of the Federal Bureau of Prisons during the commission of acts and omissions complained of.

## IV. Statement of Facts

1. I filed a lawsuit against the United States under the Federal Tort Claims Act (FTCA) in December 2015 in regards to injuries I sustained while in the custody of the Federal Bureau of Prisons (FBOP). I later amended my complaint in my lawsuit on April 4, 2018 and added a Bivens action against a prison official based on the same facts and circumstances of my FTCA claim. I was harassed and retaliated against by prison officials for my FTCA action, but I have experienced the most aggressive harassment and retaliation since the Bivens action was added.

2. I have experienced distinct, identifiable, clear, direct and indirect acts and omissions at various times, in various way and from various prison officials in relation to and corresponding to my filing of litigation in court and prison grievances in retaliation and harassment against me for an ongoing amount of time. I receive "positive reinforcement" when I make gestures in litigation and grievances in favor of the United States and its agents. And, I receive harassing, retaliating acts and omissions when I make gestures in litigation or grievances unfavorable to the United States and its agents. The acts and omissions complained of in this case are only a few examples, and named defendants are not the only prison officials culpable, guilty or liable.

3. I have been in the custody of the FBOP since August 2010, and I have witnessed and experienced prison officials networking and conspiring to retaliate against and harass inmates in a particular prison, from one prison to another, and during transit from one prison to another. Through this networking and conspiring, a prison official who wishes to adversely affect a targeted inmate(s) will do so utilizing another prison official(s) and/or inmate(s). And, prison official's exploit incidents — major or minor — for the purpose of retaliation and harassment. This networking and conspiring was definitely at work in this case.

4. On October 22, 2018, Correctional Officer (C/o) B. Johnson filed an incident report against me in which he made false, harassing, retaliating racial, sexual, threatening allegations against me. C/o Johnson is Caucasian-American, and he utilized the word "nigger" in reference to me in his false allegations. C/o Johnson was familiar with who I am prior to and at the time he wrote the incident report against me. We were familiar with each other up to two years prior to him writing the incident report. He falsely accused me of making sexual acts and comments towards him and making threatening comments in regards to doing him physical harm. His incident report was written after service of process on the prison official in the Bivens action in my lawsuit and after his colleague initiated false sexual allegations against me.

5. In incident report #3183663 on October 22, 2018, C/o Johnson reported the following: "On 10-22-18 at

3

approximately 4:20 p.m., while working as K#1 Officer, I was conducting a standing bed book count in K-Unit when inmate Tate, Raymond #27381-001 made threats of bodily harm and sexual threats towards me, and interfered with my taking official count. Specifically, when I approached cell K01-310 an inmate, later identified as Tate, was found lying in bed and covered with blankets. I instructed the inmate to get up and approach the cell window for a bed book count. The inmate then simply turned over and uncovered his head slightly. I informed the inmate this was unacceptable for count, and that he needed to stand and approach the cell door. When inmate Tate approached the door he blew a kiss at me, and said "Give me a kiss, mother fucker!" he then licked his lips, grabbed his crotch in a sexual manner, and said "Why don't you take a look at this, I'll show you a real nigga, bitch". He then said I was lucky these doors stay locked or he would get my ass."[1]

6. I know prison staff here at USP Lee, and I am known by prison staff here, because I have been at this prison since June 29, 2016 and because of my litigation and grievances. As I have stated above, C/o Johnson and I were familiar with each other for about two years prior to October 22, 2018, and we had never had any problems or altercations. I know the personalities, expectations and routines of prison staff—including Johnson. Any other time, I would only be asked to show my face, if that, during count—standing count, bed book or otherwise. On October 22, 2018 during 4 o'clock count, C/o Johnson "just happened" to be retaliatingly and provocatively "by the book."

7. As a result of the incident report written against me by C/o Johnson, I was placed in the Special Housing Unit (SHU) at approximately 8:00 a.m. on October 23, 2018. I was served Johnson's incident report at that time. The C/o who served me the incident report told me, "keep your dick out of your hand." And, another C/o who was with him asked me, "you like to gun on men?!"[2]

8. On October 23, 2018, I informed Warden Breckon that C/o Johnson had made false racial, sexual, threatening allegations against me in the incident report in retaliation for my lawsuit. Breckon took no action to address the issue.

9. C/o Johnson's incident report was submitted to the Federal Bureau of Investigation (FBI) for consideration of federal criminal prosecution against me based on his false allegations. The incident report was released for administrative processing on November 5, 2018 which allowed my prison disciplinary proceedings to begin.[3]

10. On November 21, 2018, I had a hearing before the Discipline Hearing Officer (DHO) in regards to

[1] See attached below Exhibit A, Incident Report #3183663. I am African-American. C/o Johnson is Caucasian-American.
[2] C/o Hamilton served me with Incident Report #3183663. He has been promoted to Lieutenant since then.
[3] See attached below Exhibit B, Incident Report #3183663, reserved on 11-5-18. See also attached below Exhibit C, Discipline Hearing Report; at 2, Section V., Administrative Note.

4

c/o Johnson's incident report. Johnson had charged me with committing Prohibited Act Code 203-Threatening Another with Bodily Harm, 206-Making Sexual Proposals or Threats, and 321-Interfering with the Taking of Count. The DHO only found that I committed Code 321. Yet, I received an unreasonably stiff sanction of Loss of Commissary for 180 days.[4]

11. After I saw the DHO, I informed Warden Breckon that the DHO did not find that I committed the false racial, sexual, threatening allegations c/o Johnson accused me of. Yet, Breckon took no corrective or disciplinary action.

12. During my stay in the SHU, I was deprived of my legal file/materials, I was deprived of access to the Administrative Remedy Program, and I was deprived of access to the law library and assistance from a person(s) trained in the law.

13. On October 24, 2018, SHU Property Officer S.W. White inventoried my property with me. All of my property was present except my legal file/materials. I told Mr. White that my legal file/materials were missing and that I needed them. He told me to talk to my counselor because sometimes inmates' property is not brought to the SHU all at once but some property is sometimes brought later by the counselor. He told me that if my legal file/materials were brought later he would bring them to me and we would inventory them separate. I signed the Inmate Personal Property Record acknowledging that all of my property was present except my legal file/materials. The only thing I was allowed to keep out of my property was my Bible. Mr. White deliberately did not allow me to review my property form before, during or after I signed it. He held the form down with both hands on the flap of the trap door to the cell as I signed it. I signed in blind faith.

14. On October 29, 2018, I submitted a written request and a verbal request to Mr. White in regards to my legal file/materials inquiring if he had received my legal file/materials or if he had received any information regarding them. He told me that he had not, and again he told me to talk to my counselor.

15. On November 6, 2018, I submitted a verbal and written request to Warden Breckon seeking his help in locating my legal file/materials. He never responded. I told him I had pending cases in court.

16. Subsequently, I submitted a written request to SHU Lieutenant Bellamy requesting his help in locating my legal file/materials. He advised me to talk to my counselor. I told him that I had not seen my counselor, so he told me he would put my written request in my counselor's box. Later that same day, I "miraculously" had the opportunity to see my counselor—Dink Willis—for the first time and attempted to stop him to ask him about my legal file/materials. He did not stop but he told me in passing that he had "the paper."

[4] See attached below Exhibit C; Discipline Hearing Officer Report; at 2, Sections V. and VI.

17. Counselor Willis became my counselor around March 2017 and remained so until January 23, 2019. He was my counselor during my stay in the SHU from October 2018 to January 2019. He had direct knowledge of my lawsuit prior to and during my stay in the SHU. Significantly, he did not receive any knowledge or information from me in regards to putting him on notice that my lawsuit even existed. However, prison officials who are or used to be a part of my "Unit Team" — including Unit Manager Mullins, Case Manager Collins, Counselor Willis and unnamed others — all have direct knowledge of my lawsuit because they have either been directly or indirectly in contact and communication with Assistant United States Attorneys representing the defendants in my lawsuit. On June 7, 2017, Willis gave me a copy of what was then the operative First Amended Complaint in my lawsuit with a handwritten note at the bottom of the first page from him to me notifying me of the then upcoming deposition that was held at this prison on June 9, 2017 in regards to my lawsuit. He neither received the copy of the First Amended Complaint nor any knowledge or information of the existence of the First Amended Complaint from me. [5]

18. I am a persistent litigating inmate, and I have a history of utilizing the FBOP's Administrative Remedy Program. The adverse effects of me exercising those rights is that I draw the contempt, dislike, retaliation and harassment of prison officials. Counselor Willis has a history of retaliating against me and other inmates for utilizing the Administrative Remedy Program. Around June/July 2017, he told me, "a squeaky wheel doesn't get any oil it gets replaced." He said that in regards to prison grievances I had filed. He once disdainfully called me "a filer." [6]

19. Counselors are primarily responsible for providing access to grievance forms and, in this case, my legal file/materials although the Warden is ultimately responsible. All requests I had in regards to grievance forms and my legal file/materials were always answered with the command to "talk to your counselor." See attached below Exhibit BB.

20. Counselor Willis never made himself available to me while I was in the SHU except the one time I saw him in passing. My legal file/materials were never brought to me or to the SHU. I had to file for a stay of the proceedings in my lawsuit on two separate occasions which the court granted both times on the grounds that I had no access to my legal file or the law library. I filed for the stays because the Magistrate had filed his Report and Recommendation on December 11, 2018, and the prison official-defendant in my Bivens action filed a Motion to Dismiss on December 4, 2018, however, I could not respond to those filings because I was deliberately deprived of my legal file/materials and access to the law library or assistance from person(s) trained in the law. My case was stayed 129 days. [7]

21. And, due to Willis not making himself available to me while I was in the SHU, I had no access to the

---

[5] See attached below Exhibit D, first page of First Amended Complaint, displaying Willis's handwritten note to me.
[6] See attached below Exhibit E, Grievance, dated July 3, 2017. See also attached below Exhibit F, Grievance, dated June 1, 2017.
[7] See attached below Exhibit G, Court Order, dated December 7, 2018. See attached below Exhibit H, Court Order, dated January 2, 2019. See attached below Exhibit I, Court Order, dated March 1, 2019.

Administrative Remedy Program because appropriate grievance forms are provided to inmates only by their assigned counselors, and completed grievance forms must be submitted to assigned counselors for processing. [8]

22. I have heard Warden Breckon often brag that his Special Housing Unit (SHU) is the worst SHU that anybody will ever be in. I bear witness that as far as my experience he was correct. Other inmates have acknowledged that as well. It was the third SHU that I have been in, and it was by far the worst. SHU staff daily harassed and retaliated against inmates rather than reasonably ensuring we had minimal necessities to protect our health and safety. They were the epitome of unprofessionalism. They would physically beat and abuse inmates. Inmates were beaten or abused for hours—every hour on the hour—in some cases for days. The most severe of the beatings and abuse would occur on the evening and night shifts. Inmates would be put in four point restraints and beaten and abused while restrained. Beatings and abuse consists of kneeing inmates in their rib cages, punching them in the face, grabbing and squeezing testicles and other pressure points, and twisting limbs. I have witnessed injuries sustained by inmates due to being beaten and abused by SHU staff such as broken arm, speech impediment, front teeth knocked out, body bruises, contorted limbs, etc. The screams, yells, grunting and groans of inmates could be heard throughout the SHU as they loudly called for help, pleaded for staff to stop beating and abusing them and/or simply screamed, yelled or grunted in pain. It was repugnant to the soul. The SHU is a torture chamber.

23. While in the SHU, I overheard a conversation between Warden Breckon and the inmate who sustained the speech impediment. Breckon was telling him that he had talked to the inmate's sister who had called Breckon to inquire about the inmate's health and well-being. Breckon told the inmate that his sister was talking as if the inmate was "a church boy" and that she didn't know he "was a threat to the security of the prison" because he was "smuggling drugs." Breckon said that as if the physical beating and abuse of the inmate resulting in him sustaining a speech impediment was justified because of Breckon's allegation that the inmate was a threat to security because he was smuggling drugs.

24. SHU staff would incite and/or attempt to incite inmate-on-inmate violence. Inmates who are considered to be child-molesters (cho-mo), homosexuals (homo), and/or snitches will be physically assaulted by other inmates. SHU staff knows that and will call an inmate a cho-mo, homo, or snitch, regardless of whether it is true or false, to incite inmate(s) to assault a targeted inmate(s). The prison inmate population here at USP Lee is political and racially segregated. Generally, Hispanic-American and African-American, Caucasian-American and African-American, and Caucasian-American and Hispanic-American among other groups cannot be cellmates. Yet, in the SHU, I have witnessed staff put these different races in the cell together to incite violence between inmates. A lot of times staff were successful at inciting the violence.

_____

[8] See attached below Exhibit J, Administrative Remedy Program #1330.18, Section 8(c)(1).

25. SHU staff verbally abuse inmates daily in harassment and retaliation. They verbally abuse muslim inmates by calling Muhammad a cho-mo. They call inmates snitch, cho-mo, bitch. They say shut the fuck up, son-of-a-bitch, motherfucker, etc.

26. Prison staff in general population routinely plant contraband such as knives on inmates and in their cells and falsify incident reports against them, like C/O Johnson did to me, to justify placing them in the SHU and for longer, unreasonable and unnecessary lengths of time. These tactics also subject inmates to transferral or possible transferral to another prison institution including the Special Management Unit (SMU) which is a more restrictive disciplinary institution. This also escalates animosity and tension between inmates and towards prison staff in general. These conditions breed violence and drug usage. SHU staff plant contraband on inmates and falsify incident reports against them as well.

27. Due to the harassment and retaliation against inmates by SHU staff, degenerate conditions in the SHU and the SHU constantly being crowded because of inmates serving unreasonable and unnecessary stays in the SHU, as I did, there is high tension and unrest among and between inmates and SHU staff in particular and general population staff in general. As a result, inmates regularly assault each other and lash out at one another and SHU staff verbally. SHU staff responds with more unprofessional, unreasonable and unlawful harassment and retaliation against inmates. For example, I witnessed an inmate placed in a cell with no mattress all day. He made repeated requests and pleas for a mattress that were unanswered by SHU staff. The inmate then verbally lashed out at staff who then responded by spraying a mattress with mace and giving it to the inmate to sleep on all night. The inmate was coughing, sneezing and gagging all night and into the next day due to the mace.

28. While I was in the SHU, I was locked in the cell 24 hours a day for three months. SHU staff did not favor taking inmates outdoors for recreation, so they would use tactics and excuses to cancel it and/or deny inmate(s) the opportunity to go to rec. Inmates wanting rec had to be awake, fully dressed, cell clean (resemblance of clean and orderly) and standing at the door when SHU staff made early morning rounds at about 5 o'clock. SHU staff would sneak down the range holding their keys and turning their radios down to prevent alerting inmates to their presence. Even if an inmate(s) passes those tests, rec may still be cancelled for the most unreasonable reasons such as an unclean cell that they do not provide adequate cleaning supplies for. They would say things like "it's cold outside," "it's raining," etc. to discourage inmates from wanting to go to rec. SHU staff succeeds in their efforts to discourage inmates from wanting rec because inmate(s) feel it's not worth attempting to overcome all of the obstacles to go outside in the cold in a small caged area like a zoo animal for an hour. And, inmates who are not discouraged still don't make it a lot of times.

29. SHU staff does not provide inmates adequate cleaning supplies to clean cells with. Towels, blankets, sheets and clothing are torn by inmates to make cleaning rags, but they are punished if caught by staff. Inmates are not allowed to have any hygiene items purchased off of commissary. We had to use the small quantity of

government issued hygiene products for personal hygiene and attempt to clean the walls, floor, shower, sink and toilet. We were rarely given clean laundry exchange. We had to attempt to "wash" laundry in the sink with the limited amount of government issued hygiene products. I had the same torn dirty sheets and blanket, towel and wash cloth, and socks and boxer briefs the entire three months I was in the SHU. The majority of the three months I slept on about an inch thick piece of cotton that was mildewed, dirty and full of human hairs. For about a month, I slept on a piece of cotton that was about an inch thick and half the length of my body. The upper half of my body was on the cotton, and the lower half of my body from the waist down was on the metal bunk. There are no pillows available in the SHU. And, there is a huge fan that is set by the door to the outside rec cage which is on all night blowing cold — below freezing during cold snaps — winter air throughout the SHU. It was too cold to sleep.

30. The walls in the cells in the SHU had big blotches of black mold, fungus and mildew on them. The black mold and mildew was also on the floor where the wall connects to the floor. It was a result of steam from the shower condensing on the walls, especially around the cold window frame and sill, and running down to the floor over a long period of time. The black mold was never cleaned off of the floor, walls and window. The shower walls, floors and curtains had green mold, mildew and fungus on them as a result of not being cleaned for a long period of time. There was Hispanic, Caucasian and African-American hair on the floor, bunk, mattress, sink, toilet and in the shower. Dirt and dust bunnies along with human hair covered the floor in the cell.

31. I saw a sore on an inmate's leg in the SHU that he stated was "staph infection." It resembled the staphylococcus that I have seen on posters in prisons' medical department. Unsanitary conditions in the SHU posed an unreasonable substantial risk of serious harm from the spread of diseases like staph infection and other diseases. Cell rotations were conducted about every 18 days. Inmates were regularly switched from cell to cell. Inmates were regularly coming and going being admitted to and released from the SHU. There is constant contact and potential spread of diseases between inmates.

32. Inmates in the SHU were only allowed about a four inch pencil made of flexible rubber-like material with no pencil sharpener. Filing any substantial amount of paperwork with it is impossible. This was my first experience in a SHU where an ink pen and a normal size wooden pencil were not allowed for purposes of writing, especially for legal work. It was unreasonable. The only reading material allowed was religious books such as a Bible or Quran. No radio or any other leisure activities were allowed.

33. Some inmates in the SHU were subjected to sleeping on metal bunks without a mattress because there were not enough to distribute to everybody, or in some cases, due to SHU staff's harassment and retaliation.

34. Inmates in the SHU were not given normal size toilet paper. We were given napkins that were thin and about 4 square inches. It was not conducive to a decent, reasonable wipe.

35. For three or four days after I was released from the SHU back to general population, my gums bled as I brushed and flossed my teeth. I brushed my teeth about four times a day when I was released from the SHU to clean my teeth, gums and mouth thoroughly. The toothpaste I was using was blue and white, but when I spit it out, it was a rusty greenish red from the blood and filth in my mouth. My "toothbrush" in the SHU was the likes I have never seen. It was a small, plastic thing without a handle that fixes to the tip of the finger, and it has very small bristles. However, once brushing is attempted, the thing does not stay fixed to the finger when it gets wet. It was impossible to decently brush with it. It was unreasonable.

36. As I have already stated above, the Administrative Remedy Program was not made available to me while I was in the SHU. However, I witnessed retaliation of SHU staff against inmates who were filing grievances that was sufficient to give me pause when contemplating filing a grievance. I heard C/o Ledford call an inmate who had filed a grievance a "fat bitch!" On another occasion, I heard C/o Ledford tell the same inmate, "Fuck you Melvin. That's why your grievance was denied bitch!" I witnessed another officer repeatedly delay processing an inmate's paperwork that was needed before he could transfer because he filed a grievance against her. He remained in the SHU nine months before he was finally transferred. Filing or attempting to file grievances while in the SHU was not available.

37. In contrast, in general population, I have access to television, radio and MP3 not available in the SHU. I have access to go outside for fresh air, recreation, basketball, handball, softball, walking, running, mixing and mingling with fellow inmates outdoors, etc. not available in the SHU. I access the leisure/law library to conduct legal research and prepare legal documents, mix and mingle with fellow inmates and read a variety of books, magazines and newspapers not available in the SHU. I have access to adequate cleaning supplies to clean my cell with. I have access to buy and retain in my possession quality, and sufficient quantity, of personal hygiene items not available in the SHU. I have access to laundry detergent and the laundry room to decently and reasonably wash my clothes, sheets and blankets not available in the SHU. I have pillows, a full mattress and sufficient sheets and blankets, not available in the SHU. I can walk outside in route to the dining hall to eat or retrieve meals and mix and mingle with fellow inmates rather than be fed my meals through the slot of a locked door as all of my meals are brought to me in the SHU. I can mix and mingle with fellow inmates in the day room of the housing unit and play table top board games, card games, etc. for about 12 hours a day during normal or modified operations rather being locked in the cell with one cellmate for 24 hours a day with no such leisure activities. I can enjoy more privacy in my use of the toilet and shower that I did not have in the SHU.

38. The punishment I received for the incident that occurred on October 22, 2018, it was unreasonably excessive and arbitrary. The incident report was the first that I received and my placement in the SHU was the first since I have been here at USP Lee. I have been in the custody of the Federal Bureau of Prisons (FBOP) since August 2010, yet I have never committed a Prohibited Act above a three hundred (300) series (moderate severity). And, that was my first ever placement in the SHU on a disciplinary matter. Yet, I was placed in the SHU for three months; I loss my commissary privilege for 6 months; I was deliberately deprived of my legal materials, the law library and the Administrative Remedy Program; I was subjected to the consideration of federal criminal prosecution; I was told that I was going to be transferred to another prison; I was harassed and retaliated against while I was in the SHU although I was not causing any trouble; I was subjected to degenerate conditions in the SHU that violated my Eighth Amendment right; I was subjected to defamation of character based on false racial, sexual, threatening allegations.

39. I witnessed other inmates in the SHU for greater severity prohibited acts than mine such as assault, weapons, drugs, etc. These inmates would receive 14, 30 or 45 days in the SHU and/or maybe three months no commissary, phone, email, MP3 player, etc. Most of them were multiple repeat offenders. I witnessed inmates come in and out of the SHU two, three or four times for these greater severity prohibited acts while I was in the SHU. I witnessed other inmates in the SHU with access to the law library and with possession of their legal materials.

40. The purpose of the false racial, sexual, threatening allegations in incident report #3183663 written by C/o Johnson on October 22, 2018 was to justify my immediate placement in the SHU, a longer stay in the SHU, consideration of transferral to another prison and consideration of federal criminal prosecution. Without the false allegations, none of the above would have been justified and would not have occurred. Or, at least it should not have occurred without the false allegations.

41. On January 23, 2019, I was released from the SHU back to general population after having served 92 consecutive days in the SHU since October 23, 2018. I signed the same Inmate Personal Property Record I signed on October 24, 2018 acknowledging that I received all of my property that was present on October 24, 2018 minus my legal file/materials.

42. After I was released from the SHU, I filed a motion in court in my lawsuit complaining that prison officials were violating my First Amendment right of access to the court and that I still did not have my legal file/materials or access to the law library. In response to my motion, the court, on February 4, 2019, ordered the

United States to file and serve a status report indicating when I can expect to receive my legal file and once again be allowed to visit the law library. [9]

43. When I was released from the SHU on January 23, 2019, the prison was on lockdown and did not resume normal operations until February 4, 2019. I was assigned to a different housing unit than the one I was assigned to prior to my placement in the SHU. With the new housing assignment came a new counselor and new case manager. On February 5, 2019, I spoke with both my new counselor and my new case manager — Mr. Rodney Collins — together at the same time. The first words spoken were from my counselor: "what's up with your lawsuit out there in California?" I asked them if they had received my property containing my legal materials or any information concerning them from my former counselor — Mr. Dink Willis — about which they feigned ignorance. However, my new counselor assured me that he would "check on it" for me. He then gave me a Regional Administrative Remedy Appeal form (BP-10 [grievance]) I requested.

44. On February 5, 2019, I filed the BP-10 as "Sensitive" pursuant to 28 CFR §542.14(d)(1) and FBOP Program Statement #1330.18, Administrative Remedy Program, Section 8, subsection d.1. I filed the BP-10 directly to the regional office to avoid retaliation at this prison as allowed by the grievance policy. In the BP-10, I complained of inmates being physically beaten and abused and verbally abused, prison staff planting knives on inmates and falsifying incident reports against inmates, prison staff inciting and attempting to incite inmate-on-inmate violence, and other retaliating, harassing acts and omissions of prison staff. I also complained of C/O Johnson falsifying the incident report against me; me being denied access to the Administrative Remedy Program, my legal file/materials and the law library and assistance from a person(s) trained in the law, and Counselor Willis not making himself available to me while I was in the SHU. I complained of Warden Breckon and SHU Property Officer S.W. White not addressing my requests regarding my legal file/materials while I was in the SHU. Finally, I raised the issue of a conspiracy against my rights. [10]

45. The next day — February 6, 2019 — Mr. Willis said that he "had some stuff" for me. He said give him about fifteen minutes to get it together to send it downstairs then I can go pick it up. I went at the appointed time to retrieve my legal file/materials from my Unit Manager Roger Mullins's office which is downstairs from Willis's office. I was met at Mr. Mullins's office door by a female case manager working in his office who gave me a cold stare and a frown. Mr. Mullins's demeanor was hostile towards me; I asked him

---

[9] See attached below Exhibit K, Court Order, dated February 4, 2019.
[10] See attached below Exhibit L, Grievance #969134-R1, dated February 5, 2019.

for a cart to carry my legal file/materials on because I had been in the SHU for three months without exercise so my muscles were weak. He contemptuously replied that I was about to "get a lesson in wellness." A fellow inmate offered to help me carry my legal file/materials back to my housing unit, but he was not allowed to. My legal file/materials were extremely heavy consisting of my legal file — copies of documents filed in my lawsuit, other court cases, legal notes taken during legal research, drafted legal arguments, grievances, etc. — and legal books, legal pads, etc. I struggled greatly to get back to my housing unit carrying the two laundry bags filled to capacity with my legal file/materials three to four steps at a time for about 50-60 yards. Each bag was about three feet high filled with books and paper.

46. When I inventoried my legal file/materials upon returning to my housing unit, I noticed that I was missing several items. Those items included but not limited to: mailing stamps, legal copy cards, legal notes taken during legal research regarding my lawsuit, legal arguments I had drafted in preparation of submittance to the court for filing in my pending lawsuit, select documents such as docket sheets and select pages out of documents that had already been filed in my pending lawsuit.

47. I neither received written notice or a hearing in regards to my legal file/material that were confiscated while I was in the SHU and returned to me on February 6, 2019 nor for items that were missing out of my legal file/materials when I inventoried them on February 6, 2019.

48. Mr. Mullins was one repeatedly telling me weekly that I was going to be transferred when I was in the SHU. Significantly, being transferred from the prison where the acts and omissions complained of on which my lawsuit is based originated is a part of my claim for damages in that case. And, just prior to me being released from the SHU, he told me, "they might let you back out." Who is "they?"

49. Mr. Mullins was my unit manager from June 29, 2016 up to about August 2019. He had direct knowledge of my lawsuit. He and I have had a conversation about it.

50. As unit manager, Mr. Mullins has supervisory authority over Mr. Dink Willis and Mr. Rodney Collins.

51. On February 11, 2019, the Assistant United States Attorney representing the defendants in my lawsuit filed a status report on behalf of the United States and served it on me via U.S. Postal Service pursuant to the court's order. Allowing three days for mailing, I should have received it on February 14, 2019 or at least by February 15, 2019 which is the normal, usual time frame that I have always received mail from that particular U.S. Attorney's office. However, I did not receive it until February 21, 2019. I did not receive it through normal inmate mail procedures. I received it hand-to-hand delivery from Case Manager Rodney Collins. The court's order gave

me 14 days to reply to the status report. The unreasonable delay in me receiving the status report deprived me of time to prepare my reply. Mr. Collins was directly involved in the status report as a declarant. His declaration was in opposition to my complaint to the court that his colleagues were violating my right of access to the court. Mr. Collins made statements in his declaration about the state of my affairs he had no knowledge of because I was not on his caseload, and I was neither his concern nor his responsibility during relevant times. Circumstantially, it is clear that he was allowing himself to be used as a pawn in the conspiracy against my rights.[11] The envelope the Status Report was mailed to me in is post dated "TUE 12 FEB 2019."

52. On February 21, 2019, I filed an Informal Resolution (BP-8 [grievance]) complaining about Mr. Collins's interference with my correspondence with the court and the U.S. Attorney's office. And, I complained about prison officials here at USP Lee deliberately and unreasonably interfering with my right to access the court and the conspiracy against my rights. I did not receive a response to my BP-8 from prison staff.[12]

53. On March 1, 2019, the court lifted the stays in my lawsuit. My case was stayed 129 days.[13]

54. On March 12, 2019, I filed a Request for Administrative Remedy (BP-9 [grievance]) because I did not receive a response to my BP-8 filed on February 21, 2019. I submitted a copy of the February 21, 2019 BP-8 as an attachment to the BP-9.[14]

55. On March 14, 2019, I submitted mail to prison officials, first class postage prepaid, to be sent to Regional Director, Federal Bureau of Prisons, Mid-Atlantic Regional Office, 302 Sentinel Drive, Suite 200, Annapolis Junction, Maryland 20701. The mail contained a letter notifying the Regional Director of the February 21, 2019 BP-8 and the March 12, 2019 BP-9 and continuing issues related to issues raised in the February 5, 2019 "Sensitive" BP-10. I did not receive a response to that letter from the Regional Director.[15]

56. On April 4, 2019, Warden Breckon responded to my March 12, 2019 BP-9 a day after the April 3, 2019 deadline his response was due. Besides being untimely and technically being considered a nonresponse because of the untimeliness of the response, his response misconstrued my claim, did not address all issues raised (including the conspiracy against my rights), and acquiesced in the mishandling of my mail and the interference with my correspondence with the U.S. Attorney's office, along with not thoroughly investigating my claim. He misconstrued my claim by stating that I

[11] See attached below Exhibit M, Status Report. See also attached below Exhibit N, Mailing Envelope of Status Report.
[12] See attached below Exhibit O, Informal Resolution (Grievance), dated February 21, 2019.
[13] See attached below Exhibit I, Court Order, dated March 1, 2019.
[14] See attached below Exhibit P, Grievance #971055-F1, dated March 12, 2019.
[15] See attached below Exhibit Q, Letter to Regional Director, dated March 14, 2019.

14

claimed that the United States District Court, Central District of California filed the status report on February 11, 2019. But, my claim was clearly that the status report was ordered by the Court to be filed by the United States on or before February 11, 2019 and that the return address on the face of the envelope that I received the status report in shows that it was sent to me from the United States Department of Justice, United States Attorney. The United States is represented by the United States Attorney's office in my lawsuit. And, all documents filed on behalf of the United States in my lawsuit have been sent to me by that office. And, Breckon's response states that mailroom staff contacted the Case Manager and informed the Case Manager there was a time sensitive piece of mail requiring delivery after determining the envelope did not meet the requirements for Special Mail. Any other time that my mail was sent to me from the U.S. Attorney's office, it would be sent to me from the mailroom through normal general mail procedures. These procedures includes the mailroom sending a mailbag to each housing unit with mail for inmates housed in those particular units. The mail is then passed out by correctional officers (C/os) working in those housing units — which does not include Case Managers — directly to the inmates. Those are the normal procedures followed when mail is not considered "Legal/Special Mail." When mail is considered "Legal/Special Mail" I would be called to the mailroom to personally sign for it. So, the critical question to be answered is: What was so "special" about the mail that it could not be sent to me directly as usual or that I did not have to go to the mailroom and sign for it as usual, yet it had to be sent to my Case Manager — Rodney Collins — for him to hand-deliver it to me.? And, Breckon did not address my claim about the conspiracy against my rights. He determined that my complaint was without merit and denied me relief. My claims were not thoroughly investigated as required by FBOP Program Statement #1330.18, Administrative Remedy Program, Section 13(b). I was never interviewed.[16]

57. On April 8, 2019, Regional Director D. J. Harmon responded to my February 5, 2019 "Sensitive" BP-10. Harmon stated that staff misconduct is viewed very seriously. Harmon's response states that staff conduct is governed by FBOP Program Statement #3420.11, Standards of Employee Conduct, dated December 6, 2013. Harmon's response stated that a review of my complaint had been conducted and appropriate action taken. Yet, issues I complained of still continued such as harassment and retaliation against me from prison staff, prison staff physically beating and abusing inmates, prison staff verbally abusing inmates, prison staff planting knives on inmates and falsifying incident reports against inmates, and the conspiracy against my rights. And, these issues have continued to this day. The only issues Harmon's response expressly address are my allegations that inmates are being physically and verbally abused by staff in retaliation and that staff plant knives on inmates and falsify incident reports in order to justify transfers and longer housing in the SHU. None of my other claims were expressly addressed in Harmon's response. See attached below Exhibit CC, Regional Director's Response to Grievance #969134-R1, dated 4-8-19.

---

[16] See attached below Exhibit R, Warden's Response to Grievance #971055-F1, dated April 4, 2019.

---

58. On April 4 and 9, 2019, I filed a Regional Administrative Remedy Appeal (BP-10 [grievance]) in appeal of Warden Breckon's nonresponse/response to my March 12, 2019 BP-9. I appealed Breckon's failure to thoroughly investigate my claims and his failure to address all of my claims such as the conspiracy against my rights. [17]

59. On April 22, 2019, I filed a Central Office Administrative Remedy Appeal (BP-11 [grievance]) in appeal of Regional Director Harmon's response to my February 5, 2019 "Sensitive" BP-10. I appealed Harmon's failure to address all of the issues raised in my Sensitive Regional Administrative Remedy Appeal such as the conspiracy against my rights, and my access to the courts, etc. I appealed Harmon's failure to thoroughly investigate my appeal as was required by FBOP Program Statement #1330.18, Administrative Remedy Program, Section 13(b). And, I complained about issues that I complained about that were still occurring despite Harmon's allegation that appropriate action had been taken. The Central Office Appeal (BP-11) was the final step of the grievance process. [18]

60. On April 30, 2019, Regional Director Harmon responded to my April 4 and 9, 2019 BP-10. Harmon's response alleged that Warden Breckon responded appropriately to my March 12, 2019 BP-9. Harmon denied my appeal. [19]

61. On May 16, 2019, I filed a Central Office Administrative Remedy Appeal (BP-11 [grievance]) in appeal of Regional Director Harmon's response to my April 4 and 9, 2019 BP-10. I raised the issues that Harmon's response was an acquiescence in the Warden's lack of thoroughly investigating my request, refusal to address the conspiracy against my rights and erroneously stating that my mail piece was sent to me from the court rather than appropriately stating that it was sent to me from the U.S. Attorney's Office. I also raised the issue that Harmon's response was an acquiescence of prison officials violating my rights. [20]

62. On June 14, 2019, Central Office responded to my May 16, 2019 BP-11. Central Office denied my appeal alleging that the Warden and Regional Director adequately addressed my concerns. [21]

63. On June 25, 2019, Central Office responded to my April 22, 2019 BP-11. Central Office alleged that my allegation of staff misconduct was referred to the appropriate authority. Yet again issues I complained of continued. [22]

[17] See attached below Exhibit S, Grievance #971055-R1, dated April 4 and 9, 2019.
[18] See attached below Exhibit T, Grievance #969134-A1 A2, dated April 22, 2019.
[19] See attached below Exhibit U, Regional Director's Response to Grievance #971055-R1, dated April 30, 2019.
[20] See attached below Exhibit V, Grievance #971055-A1, dated May 16, 2019
[21] See attached below Exhibit W, Central Office Response to Grievance #971055-A1, ██████████ dated June 14, 2019.
[22] See attached below Exhibit X, Central Office Response to Grievance #969134 A1 A2, dated June 25, 2019.

64. I have experienced harassment and retaliation from various prison officials, at various times and in various ways since I was released from the SHU on January 23, 2019, including but not limited to: Correctional Officer J. Woodard and his colleagues in the dining hall retaliated against me and harassed me because of my filing of the February 5, 2019 "Sensitive" BP-10. In February 2019, one of Woodard's colleagues asked me why I was writing everything up and told me to "get outta here" while I was sitting at the dining hall table eating my food. On July 10, 2019, I experienced two incidents of harassment and retaliation: (1) C/O Woodard sent an inmate to me that day to tell me that I was making people angry towards me because I was writing everything up too much and that prison staff was planning and threatening to do me harm. The inmate that Woodard sent to me was working in the dining hall for Woodard at that time. And, (2) I found a black string about 3½ feet long resembling a noose hanging from the light fixture in my cell, after prison staff working in my housing unit entered and exited my cell. Significantly, July 10, 2019 is the day I received the Central Office response to my April 22, 2019 BP-11.[23]

65. From July 17, 2019 until July 22, 2019, the general population inmates at USP Lee went on a hunger strike in protest of degenerate conditions and mistreatment by prison officials at USP Lee.

66. Correctional Officer C/O J. Woodard and his colleagues in the dining hall make direct and indirect harassing and retaliating comments and gestures towards me in relation to my lawsuit, other court cases and prison grievances. Woodard and his colleagues make "positive" and negative comments and gestures towards me in relation to my litigation of my court cases — especially and particularly my lawsuit — and prison grievances. When I file and/or make gestures in favor of the United States and its agents, their response is "positive" towards me. When I file and/or make gestures not favorable to the United States and its agents their response is negative, harassing and retaliating towards me. All of their acts and omissions are harassing and retaliating no matter whether they are meant to be so-called "positive reinforcement" or negative to deter. Woodard and his colleagues make these comments and gestures towards me when I am in the dining hall during meal times — breakfast, lunch and dinner. They are familiar with who I am because I used to work in the dining hall for Woodard from October 2016 until January 2017. Woodard and I had never had any personal problems or animosity towards each other.

67. C/O Woodard was the initiator of the false sexual allegations against me. Prior to C/O B. Johnson filing the incident report against me on October 22, 2018 in which he made false sexual allegations against me, Woodard

[23] See attached below Exhibit X, Central Office Response to Grievance #969134 A1A2, dated June 25, 2019.

told me that he was "going to tell 'them' that" I "like to 'gun' on male staff." "Gunning" is prison terminology for male inmates exposing their penis to female prison staff usually while masturbating. Significantly, I have never performed such acts, and I have no reputation or history of doing so. And, during my custody in the Federal Bureau of Prisons (FBOP) since August 2010, I have never even heard of much less witnessed male inmate(s) "gunning" on male staff. However, male inmates "gun" on female staff regularly. Further, female staff who do not like, entertain or enjoy "gunning" will let it be known by, at the very least, writing an incident report against the inmate for violating a Prohibited Act Code — usually Prohibited Act Code 205, Engaging in a sexual act. It is significant that Mr. Woodard did not write such a report against me, and if "I" had performed such an act toward him, it would be "disturbing" that he did not.

68. Circumstances suggest that Woodard followed through and did what he told me he was going to do. Subsequently, C/o Johnson wrote the false sexual allegations against me in his October 22, 2018 incident report. And, while I was in the SHU from October 23, 2018 until January 23, 2019 SHU staff falsely accused me of liking to "gun on male staff." Particularly, C/o J. Doe . C/o J. Doe repeatedly told inmates in the SHU that "I like to gun on male staff to shame me, incite inmate violence against me and "give him hell" in harassment and retaliation against me based on those false allegations. And on November 3, 2018 after I received the Process Receipt and Return forms (USM-285) in the mail from the United States Marshals Service notifying me that the prison official-defendant in the Bivens action had been served process in my lawsuit, I experienced harassment and retaliation from SHU staff. In particular, C/o Doe came to my cell door while he was distributing government issued hygiene, made sexual noises directed towards me and squirted my body wash on my cell floor as if it was ejaculated semen. As he left my door and proceeded down the range to distribute hygiene to other inmates, I made repeated requests for hygiene that were denied with his reply, "you got it." I was without hygiene for the entire week because of his antics.[24]

69. When I worked in the dining hall for Woodard, I tried to be a good worker for him. But, he and his colleagues in the dining hall began to make indirect retaliating, harassing comments and gestures towards me in regards to my pending lawsuit. They would use "buzz" words, e.g., Woodard's colleague in the dining hall confiscated my jacket one day while I was at work. He told me that I could not have it back until "February." February was the buzz word referring to a settlement conference that was scheduled for February 2017 in my lawsuit. It was around December 2016 when he confiscated my jacket.

70. I quit my job in the dining hall on January 13, 2017 due to the harassment and retaliation.

[24] See attached below Exhibits Y and Z, Process Receipt and Return forms (USM-285), dated October 2, 2018. See also attached below Exhibit AA, Mailing Envelope for USM-285 forms, post dated October 30, 2018.

71. Subsequently, c/o Woodard would make "positive" or negative comments to me when I passed through the line to receive my food in the dining hall during meal times. His comments were "positive" or negative depending on the nature of my litigation of my lawsuit. For example, his comments to me about telling "them" "I like to "gun" on male staff" happened during the time that I was persistently seeking to have service of process upon the prison official-defendant in my Bivens action through litigation of my lawsuit. Woodard made that comment to me very shortly after the last of my motions to compel service was filed on September 11, 2018. And, when I filed litigation in court in my lawsuit discussing my efforts at settlement of my lawsuit on September 25, 2018, Woodard told me, "hey girl, I'm going to put a little extra food on your tray" as I was passing through the line to receive my food during dinner time in the dining hall very shortly after that litigation was filed. It is strange for a correctional officer to be referring to an adult, heterosexual male in prison as "hey girl," but that was his twisted way of being "positive" because he was offering me more food. At another time around August/September 2018 Woodard called me a bitch, and he told me he was going to send someone to "whip your ass." All of these kinds of comments were strange and offensive. They were strange and out of the ordinary for me coming from someone I tried to be a good worker for and with whom I had never had any personal problems or animosity with. They can only be understood in light of them being retaliation against me for my lawsuit.

72. The prison official-defendant in the Bivens actions in my lawsuit was served process on October 5, 2018.

73. I am seeking $2,000,000 (two million dollars) in damages in my lawsuit for which the defendants have been harassing me and retaliating against me about. [25]

74. Correctional Officer (c/o) M. Hamilton, now Lieutenant Hamilton, is the c/o who served me with c/o Johnson's incident report on October 23, 2018. Hamilton and I have been familiar with each other since I arrived at this prison on June 29, 2016. And, I used to work for him from about April/May 2017 until October 2018 when I was assigned to the SHU. He was a Compound Officer during that time. Hamilton is notorious for verbally abusing and harassing inmates including myself. As Compound Officer, Hamilton used to sit outside under the shed on the compound and verbally harass inmates as he monitored them during mainline as inmates passed by him in route to the dining hall for lunch. During one of these times, I overheard a conversation between Hamilton, who is Caucasian-American, and an African-American inmate on a day that chicken was being served for lunch. Hamilton told the inmate that "black people love chicken and watermelon." The inmate then responded, "I'm just glad I'm not a racist cracker who likes to eat raw meat with blood in it." After c/o Woodard called me a bitch, Hamilton called me a bitch. Up until that time, Hamilton had never used that kind of language towards me. Also, in September 2018 after my motion to compel service of process on the prison official-defendant was filed in my Bivens action on September 11, 2018, Hamilton called me a

[25] My lawsuit has been pending since December 2015. It has survived initial screening, motions to dismiss and summary judgment stages of the proceedings. I am seeking leave to amend my complaint to request $3,500,000 in damages.

19

"troublemaker." About a day or two prior to that, a retaliatory search had been conducted in my cell by prison officials during which my property was left in disarray and scattered around the cell while my cellmates property was untouched and still in order. Particularly, my legal file/materials were left in disarray and scattered around the cell. I also personally witnessed Hamilton physically beating and abusing an inmate in the SHU while I was housed in the SHU. I could hear the inmate grunting and groaning in agony and pain. Finally, around June/July 2018, Hamilton told me he was going to "fuck your girlfriend" and that he "bet she's ugly." Since he made these comments to me, I have not received any more correspondence from my girlfriend.

75. When C/o Hamilton used to work outside on the prison compound as the Compound Officer, I used to see him regularly — five days a week. But, since he has been promoted to Lieutenant, he has been working on post in the SHU since I was released from the SHU on January 23, 2019. Therefore, I have not had a lot of contact with him since I was released from the SHU. However, on October 25, 2019 when I had an encounter with Hamilton, he referred to me as "the fag in F Unit." F Unit is the housing unit that I have been housed in since I was released from the SHU. Other inmates were present when he made those comments to me. We were taking showers at the time.

76. Since I have been released from the SHU, it has been a steady, consistent rumor that Hamilton has been continuously active in beating and abusing inmates in the SHU.

77. I have continued to experience harassing and retaliating acts and omissions from various prison officials, at various times and in various ways.

78. On December 27, 2019, as my cellmate, another inmate and I were returning from the dining hall in route to our assigned housing unit, we encountered Lieutenant Hamilton in passing as he walked in the opposite direction. He initiated conversation: "well ain't this a sad bunch here." And, to me in particular he said, "the tall dumb one who likes to file and cause trouble."

79. And, in interfering with my access to the courts, my Unit Team — which includes my case manager Rodney Collins — confiscates and holds in their possession my civil docket sheets in the case of my pending lawsuit. The only way that I can review the docket sheets is to request their permission to do so while they are present. However, I will have the opportunity to do so once in a week during normal prison operations. Normal operations are not "normal" at this prison. This prison spends more time — about 85% to 90% of the time — on lockdown than normal operations. The civil docket sheet is the primary means for me to keep abreast of what is filed in the case in my lawsuit. I am litigating my lawsuit pro se. I am indigent, and I do not have access to the courts' electronic filing systems.

80. On March 1, 2020 at approximately 11:55 a.m., I exited the dining hall during lunch and stood in a line of about 20-30 inmates waiting to pass through the metal detector in the corridor in route to retrieve my coat in the corridor and return to my housing unit. Correctional Officers S. Hutchins and J. Robbins were standing in the corridor monitoring the metal detector and pat searching inmates who set off the metal detector as they passed through. When I passed through the metal detector it did not alert, so I proceeded to walk down the corridor to retrieve my coat. Hutchins yelled, "hey, go back through!" I turned around to see who he was talking to. I saw that he was looking at me, so I said, "who me?" He responded, "no the guy behind you!" No one was behind me. I told Hutchins that I did not set the metal detector off, but I complied with his direct order and passed through the metal detector again twice. It did not alert either time. I said, "see it wasn't me." Robbins then walked over and whispered in Hutchins's ear. Hutchins has a boisterous, obnoxious, hostile and aggressive demeanor, and he turned it up a couple of notches after Robbins whispered in his ear. He then said, "go through the metal detector again. I ain't got nothing but time. I can do this all day!" I passed through the metal detector again. It did not alert. I proceeded to walk away to retrieve my coat. Hutchins then told me, "come here!" He called me a "troublemaker who likes to file," and he told me to take off my boots. He then told me, "hand them to me one at a time." I picked them up and handed him one. He then yelled, "I didn't tell you to pick up both of them!" He searched both boots and found nothing in them. As he was searching my boots I was silently looking at his name tag. He then yelled, "I don't care about you looking at my name tag everybody knows me I'm Hutchins I don't care about you filing against me!" I put my boots on and walked away to retrieve my coat. He stopped me and told me to "turn around" so he could pat search me. As he was searching me I was looking at Robbins who was looking at me with a malicious, mischievious grin and shaking his head. Robbins has covertly been a part of the ongoing conspiracy of retaliating against me and harassing me for filing lawsuits and grievances. Robbins knows who I am and he has familiar with me nearly the entire time I have been at this prison. He and Hamilton are close colleagues, and we have all known each other for the same amount of time. I have spoken to both Robbins and Hamilton together on numerous occasions in small-talk conversations, and I have never had any personal altercations with Robbins outside of his covert acts and omissions towards me in the conspiracy against my rights. And, I had never had any interaction with Hutchins. I recognize Hutchins's and Robbins's actions in this incident to be a part of the continuing chain of events I have experienced over the past several years in retaliation and harassment against me for filing lawsuits and grievances. Robbins also has a history of planting contraband—including knives—on inmates to justify writing false incident reports against them and having them placed in the Special Housing Unit and/or being transferred. After Hutchins pat searched me, I walked away to go retrieve my coat. As I was walking away,

Hutchins yelled out, "he was staring at my name tag with one of those come fuck me looks. I may have to write PREA!" As I was walking toward the door to exit the corridor after retrieving my coat Hutchins told me to "come here!" He told me, "give me your ID!" He held it up and read my name out loud. He kept my ID. As I exited the door an inmate behind me told Hutchins "give him his ID he didn't do nothing." He replied, "I'm not giving his ID back I'm coming to search the unit and lock it down!" That is a tactic used by prison staff to try to turn inmates against each other and possibly cause inmate-on-inmate violence. Also, there has been animosity from prison staff towards my housing unit because inmates in my unit regularly file grievances and complaints against prison staff.

This incident appeared to start as an innocent mistake on Hutchins's behalf. But he allowed his own bad judgment, Robbins's instigation and co-conspirators to influence him to deliberately exploit the incident to retaliate against me and harass me for filing grievances and lawsuits — particularly this case. Significantly, the Defendants in this case filed their first pleading (Doc. 26) in this case on February 27, 2020. Three days prior.

81. Due to the Defendants' acts and omissions, I suffered injuries in the form of my First, Fifth and Eighth Amendment rights being violated; my access to the court and the litigation of my lawsuit was chilled and impeded for 129 days; my lawsuit was brought to the precipice of being bungled; I was deprived of my confiscated legal file/materials for over three months; my legal file/materials were confiscated and not returned to me; I was deprived of access to the Administrative Remedy Program; I was sexually and racially harassed and retaliated against; I was subjected to false sexual, racial, threatening allegations; I was subjected to character assassination, defamation of character and damage to my reputation; I was harassed and retaliated against for filing grievances and lawsuits; I was subjected to referral to the Federal Bureau of Investigation for consideration of federal criminal prosecution; I lost liberty and privileges for the 92 days I was confined in the SHU; I was subjected to degenerate prison conditions that exposed me to an unreasonable, substantial risk of serious harm; I was subjected to consideration and threats of transferral; I was subjected to verbal abuse.

## V. Declaration

I declare under penalty of perjury that all facts in this First Amended Complaint are true and correct. Executed on 4-6-2020. Raymond Tate. See 28 USC §1746.

22

## VI. Claims for Relief

82. Each named defendant is liable for the violation of my First, Fifth and Eighth Amendment rights and injuries I sustained as a result.

83. The acts and omissions of all named defendants was a conspiracy that violated my First, Fifth and Eighth Amendment rights.

84. I sustained injuries as a result of the defendants' violation of my First, Fifth and Eighth Amendment rights.

85. I was deprived of liberty and property without due process of law. I was subjected to cruel and unusual punishment. I was harassed and retaliated against for filing lawsuits and grievances. I was denied access to the court.

86. I have sustained injuries over a long period of time, and I continue to sustain injuries due to all named defendants' acts and omissions that continue and continues to violate my First, Fifth and Eighth Amendment rights.

## VII. Requested Relief

Plaintiff requests that the Court grant the following relief:

87. Declare that each named defendant is liable for the violation of my First, Fifth and Eighth Amendment rights and injuries I sustained as a result.

88. Award Plaintiff compensatory damages: FN
    a) $500,000 (five hundred thousand dollars) against each defendant in their individual capacity for injuries I sustained as a result of the violation of my Fifth Amendment rights,
    b) $500,000 (five hundred thousand dollars) against each defendant in their individual capacity for injuries I sustained as a result of the violation of my Eighth Amendment rights,
    c) $500,000 (five hundred thousand dollars) against each defendant in their individual capacity for injuries I sustained as a result of their conspiracy that violated my Fifth Amendment rights, and
    d) $500,000 (five hundred thousand dollars) against each defendant in their individual capacity for injuries I sustained as a result of their conspiracy that violated my Eighth Amendment rights.

FN Compensatory and punitive damages are requested against each defendant except the United States of America. The United States is named as a defendant for purposes of injunctive relief only.

89. Award Plaintiff punitive damages:

a) $1,000,000 (one million dollars) against each defendant in their individual capacity for violating my Fifth Amendment rights,

b) $1,000,000 (one million dollars) against each defendant in their individual capacity for violating my Eighth Amendment rights,

c) $1,000,000 (one million dollars) against each defendant in their individual capacity for their conspiracy that violated my Eighth Amendment rights, and

d) $1,000,000 (one million dollars) against each defendant in their individual capacity for their conspiracy that violated my Fifth Amendment rights.

All above punitive damages should be awarded to punish the defendants for their intentional, malicious, reprehensible conduct that displayed reckless, callous, deliberate indifference to my rights and deter them and others from committing the same or similar acts and omissions in the future.

90. Grant Injunctive Relief

Issue a preliminary and permanent injunction against each defendant in their official capacity to prohibit acts and omissions complained of and future acts and omissions that have the same effects of the acts and omissions complained of that violate my rights. See Doc. 3.

## VIII. Exhibit List

The following Exhibits are referenced in the Statement of Facts section (pages above and are attached to this Complaint below:

| Exhibit | Document |
|---|---|
| A | Incident Report #3183663 |
| B | Incident Report #3183663 re-served |
| C | Discipline Hearing Officer Report |
| D | First Amended Complaint (first page) |
| E | Grievance dated July 3, 2017 |
| F | Grievance dated June 1, 2017 |
| G | Court Order dated December 7, 2018 |
| H | Court Order dated January 2, 2019 |
| I | Court Order dated March 1, 2019 |
| J | Federal Bureau of Prisons Program Statement #1330.18, Section 8(c)(1) |

| K | Court Order dated February 4, 2019 |
| L | Grievance #969134-R1 dated February 5, 2019 |
| M | Status Report filed February 11, 2019 |
| N | Mailing Envelope for Status Report postmark dated TUE 12 FEB 2019 |
| O | Informal Resolution dated February 21, 2019 |
| P | Grievance #971055-F1 dated March 12, 2019 |
| Q | Letter to Regional Director dated March 14, 2019 |
| R | Warden's Response to Grievance #971055-F1 dated April 4, 2019 |
| S | Grievance #971055-R1 dated April 4 and 9, 2019 |
| T | Grievance #969134-A1A2 dated April 22, 2019 |
| U | Regional Director's Response to Grievance #971055-R1 dated April 30, 2019 |
| V | Grievance #971055-A1 dated May 16, 2019 |
| W | Central Office Response to Grievance #971055-A1 dated June 14, 2019 |
| X | Central Office Response to Grievance #969134-A1A2 dated June 25, 2019 |
| Y | USM-285 dated October 2, 2018 |
| Z | USM-285 dated October 2, 2018 |
| AA | Mailing Envelope for USM-285 forms postmarked dated October 30, 2018 |
| BB | Federal Bureau of Prisons Program Statement #1315.07, Inmate Legal Activities |
| CC | Regional Director's Response to Grievance #969134-R1 dated April 8, 2019 |

## IX. Certificate of Service

On April 6, 2020, this First Amended Complaint was delivered to prison officials, first class postage prepaid, as legal mail, to be sent to the United States District Court, 210 Franklin Road, S.W., Room 540, Roanoke, VA 24011 and AUSA Krista Consiglio Frith, P.O. Box 1709, Roanoke, VA 24008-1709. I declare under penalty of perjury the foregoing is true and correct. Executed on 4-6-2020. Raymond Tate. See 28 USC §1746.

Raymond Tate #27381-001
United States Penitentiary Lee
P.O. Box 305
Jonesville, VA 24263

United States District Court
210 Franklin Road, SW, Room 540
Roanoke, VA 24011

Legal Mail